MARY CATHERINE KELLY GORMAN,
Administratrix of the Estate of
Elijah Kelly, Deceased,

        Plaintiff,

v.

GARRY McFADDEN, Mecklenburg County Sheriff, in his individual and official capacities; TELISA WHITE, in her individual and official capacities; JOHN DOEs (1-4), DANIEL T. BIONDI, M.D., in his individual and official capacities; MECKLENBURG COUNTY, NORTH CAROLINA; PLATTE RIVER INSURANCE and RESERVE HEALTH, P.C.,

        Defendants.

**COMPLAINT**

---

## NATURE OF THE CASE

1. This civil rights action arises from the wrongful in-custody death of Elijah Kelly, age 71, inside the Mecklenburg County Jail, hereinafter "MCDC" on December 14, 2023.

2. At the time of his death, Mr. Kelly was housed in Pod 1800, Cell 1806, under twice-per-hour direct observation.

3. Mr. Kelly was discovered unresponsive at approximately 4:31 a.m. on December 14, 2023, and was pronounced dead at 5:14 a.m., after unsuccessful resuscitation efforts.

1

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343, as Plaintiff asserts claims arising under 42 U.S.C. § 1983 and the Fourteenth Amendment.

5. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a), as such claims arise from the same nucleus of operative facts and form part of the same case or controversy.

6. Venue is proper under 28 U.S.C. § 1391(b) because a substantial number of the acts and omissions giving rise to this action occurred within the Western District of North Carolina.

## PARTIES

7. Plaintiff, Mary Catherine Kelly Gorman, appears in this action as the duly authorized representative of the Estate of Elijah Kelly, pursuant to N.C. Gen. Stat. §§ 28A-18-1, 28A-18-2, and 28A-18-3. She is a resident of Charlotte, Mecklenburg County, North Carolina.

8. Defendant Garry McFadden ("Sheriff McFadden") was, at all relevant times, the elected Sheriff of Mecklenburg County, the final policymaker over all jail operations, supervision systems, medical-care delivery systems, training, and staffing at the Mecklenburg County Detention Center ("MCDC").

9. Sheriff McFadden has a non-delegable statutory duty to ensure the safety, supervision, and medical care of all detainees. He is sued in his individual and official capacities.

10. Sheriff McFadden is individually liable under §1983 for failing to correct or prevent constitutionally inadequate medical care and supervision practices at MCDC where he had knowledge of ongoing deficiencies yet failed to act. McFadden had sufficient

2

knowledge of Wellpath's ongoing constitutionally inadequate healthcare" and systemic supervision deficiencies. Sheriff McFadden is liable in his official capacity as jail medical and supervision practices manifested deliberate indifference and arose from longstanding customs, policies, and failures to train or supervise.

11. Sheriff McFadden is individually liable under Plaintiff's §1983 claim (Count I) because he had actual or constructive knowledge of systemic unconstitutional practices at the jail—including failures in medical care, failures to respond to serious medical needs, understaffing, and chronic supervision violations—and nevertheless failed to take corrective action.

12. Sheriff McFadden acted under color of state law at all times relevant to this Complaint.

13. Defendants John Doe Officers 1–4 were the Pod 1800 detention officers assigned to conduct supervision rounds at checkpoints 1855d and 1855c between December 13 and December 14, 2023. Their identities are currently unknown due to redactions in produced records. They are sued in their individual capacities.

14. Defendant Telisa White served as the MCDC Jail Administrator/Chief of Detention, responsible for operational oversight, supervision compliance, staffing, and ensuring adherence to North Carolina jail regulations. She is sued in her individual and official capacities.

15. Defendant Mecklenburg County is a local governmental entity established under Chapter 153A of the North Carolina General Statutes. Under N.C. Gen. Stat. §§ 153A-217 and 153A-218, Mecklenburg County is responsible for funding, designing, constructing, and making proper rules and regulations for MCDC.

3

16. Upon information and belief, by obtaining liability insurance and/or participating in a governmental risk pool or contractually requiring its agents to purchase liability insurance and name Mecklenburg County as an additional insured, the County, on its own behalf as well as on behalf of its agents, has waived governmental and sovereign immunity.

17. Defendant COUNTY OF MECKLENBURG (also referred to as, "Mecklenburg County") maintains and operates the Mecklenburg County Detention Center, located at 801 East Fourth Street, Charlotte, NC, 28202.

18. Defendant Mecklenburg County is responsible under N.C.G.S. § 153A-224 for ensuring the Detention Center custodial personnel provide continuous supervision to protect prisoners from harm.

19. Defendant Mecklenburg County is responsible under N.C.G.S. § 153A-225 for developing an adequate medical plan to provide medical care to prisoners at the Mecklenburg County Detention Center, including the medical supervision of prisoners and emergency medical care for prisoners to the extent necessary for their health and welfare. *See Stockton v.Wake County*, 173 F.Supp.3d 292, 303-04 (E.D.N.C. 2016).

20. Defendant Mecklenburg County is sued under 42 U.S.C. § 1983 for an official policy or custom of deliberate indifference to the safety of residents from inadequate supervision, failure to make direct observations, and failure to address the serious medical needs of residents, like Mr. Kelly.

21. Under its authority, Defendant Mecklenburg County operates and manages the county jail  and is and was at all relevant times mentioned herein responsible for the actions and/or inactions and the policies, procedures, and practices/customs of Defendant Gary

4

McFadden and his respective employees and/or agents. Defendant McFadden operates the Mecklenburg County Jail and is and was responsible for ensuring the provision of emergency and medical and mental health care services to all Mecklenburg County Jail residents. Defendant COUNTY OF MECKLENBURG has authority to sue and be sued, to purchase and make contracts, to dispose of and resolve legal actions and tort claims, to provide for jails and corrections, and to operate and/or be responsible for county health facilities, such as its jails through contracts, joint ventures or partnerships.

22. Defendant McFadden is a governmental department fully funded and overseen by the Defendant Mecklenburg County.

23. Defendant Mecklenburg County is responsible for all deputy training, discipline, hiring, firing, maintaining deputy and staff records, and to taking corrective actions as it affects Defendant McFadden and the Mecklenburg County Sheriff's Office and its jails, prisoners and pretrial detainees and deputy officers and staff.

24. Defendant Mecklenburg County entered into a contract with Correct Care Solutions ("CCS", acquired by HIG Capital in 2013, to provide through its employees, agents and representatives medical, dental and mental health care to COUNTY adult and juvenile correctional facilities. Wellpath is owned by the private equity firm H.I.G. Capital and was created in 2018 through a merger of Correct Care Solutions (CCS) with Correctional Medical Group Companies. The contract was later extended multiple times through November 2024; however, Wellpath terminated its services provided to Defendant McFadden effective May 2024.

25. Defendant Mecklenburg County, jointly with former medical provider Wellpath and Defendant Sheriff McFadden, was and is responsible to develop joint policies and

procedures affecting residents with serious medical needs in custody and to provide continuity of care from the time a resident is booked until they are released.

26. Defendant Mecklenburg County was and is responsible for overseeing that Defendant McFadden's staff complies with their contractual medical responsibilities to prisoner's mental health care.

27. Upon information and belief, by obtaining liability insurance and/or participation in a governmental risk pool or contractually requiring its agents to purchase liability insurance and name Defendant Mecklenburg County as an additional insured, the County, on its own behalf as well as on behalf of its agents, has waived governmental and sovereign immunity.

28. Upon information and belief, Sheriff Gary McFadden and Mecklenburg County are self- insured up to one million five hundred thousand dollars ($1,500,000.00).

29. Upon information and belief, Mecklenburg County is the named insured under a public officials' liability policy with Safety Specialty Insurance Company.

30. Upon information and belief, Mecklenburg County is the named insured under a law enforcement liability policy with Safety Specialty Insurance Company.

31. . Upon information and belief, Mecklenburg County is the named insured under an excess liability policy with Safety National Insurance Company.

32. Upon information and belief, Mecklenburg County has a Law Enforcement Liability insurance policy with Safety Specialty Insurance Company.

33. Upon information and belief, Mecklenburg County have a Public Officials and Employment Practices Liability insurance policy with Safety Specialty Insurance Company.

34. Upon information and belief, Defendant Mecklenburg County has an Excess Liability insurance policy with Safety National Insurance Company.

35. Upon information and belief, the contract between the Mecklenburg County Sheriff's Office and its former healthcare provider Wellpath was pre-audited in a manner required by the Local Government Budget and Fiscal Contract Act by Sarah Cunningham of Defendant Mecklenburg County.

36. Defendant COUNTY OF MECKLENBURG has knowingly maintained and tolerated longstanding and systemic deficiencies in the Mecklenburg County Jail's provision of emergency treatment to seriously ill prisoners. It has also knowingly had inadequate medical and mental health staffing as well as policies and procedures that were likely in violation of an existing court order directing minimum standards of medical treatment at the jail.

37. Defendant Platte River Insurance Company is the surety on Sheriff McFadden's official bond. Pursuant to N.C. Gen. Stat. § 58-76-5, Platte River is liable for injuries proximately caused by the neglect, misconduct, or malfeasance of the Sheriff and his deputies.

38. Defendant Platte River Insurance is a Nebraska company and sued as the Sheriff's surety under N.C.G.S. § 58-76-5.

39. Upon information and belief, Platte River Insurance issued the statutorily mandated surety bond to Mecklenburg County Sheriff McFadden, pursuant to N.C.G.S. § 58-76.

40. On December 14, 2023, Sheriff McFadden was obligated under state law to obtain and maintain said surety bond and by doing so, waived sovereign immunity as to the claims in this matter, at least to the extent of the bond.

41. Plaintiff sues Platte River Insurance Company to recover on the Sheriff's bonds, respectively, for the neglect and/or malfeasance of Sheriff McFadden and his employees whose actions and inactions proximately caused Mr. Kelly's death.

42. Upon information and belief, by obtaining coverage via surety bond and/or liability insurance and/or participation in a government risk pool, Sheriff McFadden, on his own behalf as well as his agents, waived governmental and sovereign immunity.

43. Defendant Biondi is a resident of Mecklenburg County, is a physician licensed under the laws of the State of North Carolina and is a health care provider for Reserve Health, P.C. It is also admitted that he was contracted by Defendant Mecklenburg County and Sheriff McFadden to provide medical services to the Mecklenburg County Detention Center.

44. Upon information and belief, defendant Daniel T. Biondi, MD ("Dr. Biodi") is, and was at all times relevant herein, a physician duly licensed under the laws of the State of North Carolina and a health care provider practicing in his profession within Mecklenburg County, North Carolina, as an agent and employee of Mecklenburg County and/or Sheriff McFadden. Dr. Biondi is being sued *in his individual capacity and official capacity.*

45. At the time of Mr. Kelly's death, Defendant Biondi was the Medical Director and Chief Physician at the Mecklenburg Detention Center.

46. At all relevant times herein, Dr. Biondi was the Medical Director of MCDC and charged with the care, custody and safekeeping of inmates and detainees at the MCDC.

8

47. At all times relevant, Defendant Biondi was an agent and employee of Sheriff McFadden or, in the alternative, Mecklenburg County.

48. Upon information and belief, Dr. Biondi did not form a physician patient relationship with Elijah Kelly. Thus, Plaintiff's claims against Dr. Biondi herein do not constitute a medical malpractice claim, pursuant to N.C. Gen. Stat. § 90-21.11.

49. Upon information and belief, Defendant Reserve contracted with Defendants Mecklenburg County and McFadden for the services of a Medical Director, medical physician services and medical nursing services for the detainees of the Detention Center.

50. Upon information and belief, Defendant Reserve Health, P.C. ("Reserve") is North Carolina corporation, licensed and doing business in Mecklenburg County, North Carolina, with employees, servants, and agents in Mecklenburg County and which, at all relevant times, was under contract with Mecklenburg County and/or Sheriff McFadden and employed and/or contracted onsite clinicians and medical staff to be the medical and/or mental healthcare providers for residents of MCDC.

51. Reserve is sued herein for its own tortious wrongdoing, as well as under theory of *respondeat superior* for the acts and failures to act of its employees and agents responsible for providing medical and/or mental healthcare and services at MCDC.

52. Defendant John Doe Officers 1–4 were assigned to Pod 1800 and were responsible for conducting visual rounds within the required time intervals under 14J .0601(a). Their failure to conduct required rounds directly contributed to the circumstances of Mr. Kelly's death.

53. Defendant Telisa White, as Jail Administrator/Chief of Detention, exercised supervisory authority over Pod 1800 and was responsible for ensuring staffing adequacy, supervision-round compliance, adherence to DHSR standards, and correcting known deficiencies

54. At all relevant times, each individual Defendant acted under color of state law.

55. Upon information and belief, at all relevant times Biondi was responsible for implementing, overseeing, and enforcing the Jail's mental-health policies and procedures.

56. Biondi participated in and/or approved the policies, customs, and practices governing how mentally ill and medically fragile detainees – including Elijah Kelly – were screened, classified, and monitored within MCDC, and how custody staff were to respond to mental-health and medication-related risks.

57. At all relevant times, Biondi acted under color of state law and within the course and scope of his employment and/or contractual relationship with Mecklenburg County and its Sheriff. By virtue of his role in directing mental-health services at the Jail, Biondi is a state actor for purposes of claims under 42 U.S.C. § 1983.

58. Upon information and belief, Biondi knew or reasonably should have known that detainees such as Elijah Kelly faced an elevated risk of self-harm, impulsive overdose, and undetected medical decline if not appropriately screened, classified, and monitored.

59. Biondi conduct, as alleged herein, constituted deliberate indifference to Mr. Kelly's serious medical and mental-health needs, and to the substantial risk that Mr. Kelly would suffer serious harm or death from quetiapine toxicity and undetected medical deterioration. Biondi is liable to Plaintiff under 42 U.S.C. § 1983 and North Carolina

law for the injuries and wrongful death proximately caused by his actions and failures to act.

<u>**FACTUAL ALLEGATIONS**</u>

60. Mr. Kelly was a 71-year-old medically fragile, psychologically vulnerable pretrial detainee housed at MCDC. His 337-page Wellpath chart documents numerous serious chronic medical conditions, including COPD, hypertensive and atherosclerotic cardiovascular disease, metastatic prostate cancer, chronic Hepatitis C, alcohol use disorder, chronic inguinal hernia, intermittent explosive disorder and early hepatic fibrosis.

61. Mr. Kelly's frailty was compounded by having had a recent hospitalization from November 16 through 17, 2023 at Atrium Health, where he presented with abdominal pain, severe shortness of breath, dizziness, weakness, and concerns for cancer progression.

62. Hospital notes from November 16, 2023, describe Mr. Kelly as "sleepy appearing, nontoxic" but with persistent respiratory complaints, difficulty walking, and being "placed in jail" with no ability to self-monitor. CT imaging revealed possible bone metastases and significant lung disease.

63. After the hospital discharged him to MCDC, Mr. Kelly remained medically vulnerable. Repeated clinical observations from October to December, 2023, documented dangerously elevated blood pressures, chest tightness, acute respiratory struggles, and escalating COPD symptoms.

11

64. In addition to his physical frailty, Wellpath mental-health records show that Mr. Kelly was psychologically overwhelmed. On October 30, 2023, a mental health professional documented feelings of hopelessness, fear, and inability to cope.

65. From his arrival at MCDC through December, 2023, Mr. Kelly repeatedly submitted sick call requests for severe respiratory distress, including notes such as "VERY DIFFICULT TO BREATH EMERGENCY PLEASE."

66. Despite this history, the Sheriff's office failed to classify Mr. Kelly to a medical observation unit but instead housed him in general population, in Cell 1806, between electronic tour checkpoints 1855d and 1855c, locations known within the facility for unreliable and frequently falsified supervision rounds.

67. On December 20, 2023, after Mr. Kelly's death, the North Carolina Division of Health Service Regulation (DHSR) conducted a compliance investigation. DHSR reviewed the Pod 1800 electronic rounds logs from December 13 through 14, 2023, and found that MCDC staff did not conduct supervision rounds as required by law, repeatedly exceeding the 40-minute maximum on December 13, the day before Mr. Kelly's death.

68. Specifically, DHSR and the Sheriff's office's own Plan of Correction identify the following gaps in observation for Mr. Kelly's pod on December 13, 2023:

    (a) 4:27 a.m. → 5:22 a.m. (55 minutes)

    (b) 5:22 a.m. → 6:05 a.m. (43 minutes)

    (c) 6:05 a.m. → 6:50 a.m. (45 minutes)

    (d) 9:55 a.m. → 10:55 a.m. (60 minutes)

69. DHSR expressly concluded that MCDC "was not conducting supervision rounds as required." These findings were made against a backdrop of years of DHSR citations for

missed checks, chronic understaffing, and noncompliance with 14J .0601 at Mecklenburg County's detention facilities.

70. At the same time, Wellpath eMARs and medication logs from October through December, 2023, show systemic problems with medication administration and supervision, including:

    a. repeated "Out of Unit" entries for core daily medications (e.g., antihypertensives, COPD medications, inhalers);

    b. frequent "In Transit from Pharmacy" and "Released" entries; and

    c. numerous unchecked administration times, all of which reflect dozens of instances in which staff could not or did not verify that medications were timely delivered and ingested.

71. Mr. Kelly refused many medications, including antihypertensives, inhalers, folic acid, thiamine, and eye drops. However, both the Wellpath records and autopsy findings confirm that he never refused quetiapine or trazodone, the sedating psychiatric medications ultimately responsible for his death.

72. Despite the known risk of quetiapine hoarding and abuse in correctional settings, the Sheriff's office failed to monitor ingestion of quetiapine, failed to perform mouth checks, and failed to assess Mr. Kelly for hoarding behavior.

73. Mr. Kelly's eMAR shows a dangerous pattern of unverified, unmonitored administration of psychiatric medication. In the weeks before his death, many quetiapine and trazodone entries appear as "Released," "In Transit From Pharmacy," "Out of Unit," or otherwise lack documentation that pills were actually ingested.

74. The Sheriff's office staff allowed quetiapine to be hoarded and taken in toxic quantities.

13

75. Mr. Kelly's condition continued to deteriorate. On November 21, 2023, a Wellpath provider documented worsening COPD, shortness of breath, and chest pain. Later records show blood pressure readings as high as 161/108 and persistent respiratory instability.

76. Nursing notes on December 11, 12, and 13, 2023, reflect that Mr. Kelly continued to complain of difficulty breathing, chest tightness, intractable abdominal pain, and fatigue. These were additional opportunities to modify Mr. Kelly's housing status, increase observation, and evaluate him for suicidal or self-injurious risk.

77. In the early morning hours of December 14, 2023, the day of Mr. Kelly's death, Wellpath nursing progress notes document the following sequence of events:

    a. At 4:34 a.m. – A medical code (10-180) is called for Pod 1800.

    b. Upon arrival, nursing observes an employee of the Sheriff's office performing CPR on Mr. Kelly.

    c. Mr. Kelly is described as "cold to touch" and unresponsive with no palpable pulse.

    d. A defibrillator is attached, which repeatedly advises "No shock."

    e. Nursing and officers continue chest compressions and apply oxygen.

    f. EMS arrives and continues resuscitative efforts.

    g. Mr. Kelly is pronounced dead at 5:14 a.m.

78. These events are corroborated across multiple nursing notes and the Wellpath emergency documentation.

79. The Report of Inmate Death lists Mr. Kelly's last supervision round (alive) as 4:17 a.m. and his time found in distress as 4:31 a.m. Once again, the Sherrif's office relies

14

exclusively on an officer's logged "round" time, with no evidence of meaningful visual observation or assessment during the period in which Mr. Kelly likely entered medical crisis.

80. The Autopsy Report determined that the cause of death was quetiapine toxicity. Toxicology testing revealed levels that:

    a.  "Greatly exceed expected therapeutic levels;"

    b.  "Could not have resulted from use as prescribed;"

    c.  Are best explained by hoarding ("cheeking") quetiapine tablets with intent to ingest a large quantity; and

    d.  Confirm that the "decedent never refused quetiapine or trazodone."

81. The OCME Investigation Report states that Mr. Kelly was last known alive at approximately 23:59 on December 13, 2023, meaning he may have been in medical decline for hours before being discovered during morning rounds.

82. The combination of:

    a.  supervision gaps,

    b.  lack of supervision rounds,

    c.  failure to monitor psychiatric medication ingestion,

    d.  known risks of quetiapine hoarding,

    e.  untreated or undertreated respiratory distress, and

    f.  failure to place Mr. Kelly on an appropriate medical or suicide watch

placed Mr. Kelly at an obvious, substantial, and unreasonable risk of death, which Defendants consciously disregarded.

83. When confronted with DHSR's findings, the Sheriff's office did not dispute the missed rounds. Instead, in its written Plan of Correction, Sheriff McFadden's office argued that these supervision gaps were "not significant factors" in Mr. Kelly's death because there were no additional >40-minute gaps in the 17½ hours immediately preceding Mr. Kelly's discovery.

84. The Sheriff has a non-delegable duty to perform timely safety checks.

85. MCDC's own Plan of Correction confirms the systemic nature of the supervision failures. Among other things, it acknowledges the need to:

a. Require Pod Supervisors to initiate round start and end times and document them in the Offender Management System;

b. Conduct random reviews of electronic pod tours against shift logs;

c. Conduct random reviews of video recordings to ensure that written documentation matches actual rounds.

86. These remedial measures would not be necessary if MCDC's supervision system were functioning properly. Their adoption after Mr. Kelly's death is an implicit admission that prior practices were inadequate and dangerous.

87. In light of Mr. Kelly's age, medical history, recent hospitalization, psychiatric vulnerability, and repeated respiratory complaints, Defendants knew or reasonably should have known that:

a. he required heightened observation;

b. he was at risk of self-harm or impulsive overdose; and

c. failure to conduct rounds and monitor medication ingestion could result in serious harm or death.

88. Had Defendants timely and properly performed the supervision rounds required by law, and had they reasonably monitored quetiapine administration, Mr. Kelly's medical deterioration, hoarding behavior, and/or reduced responsiveness would have been detected. Appropriate interventions—such as placing him on a higher level of observation, removing access to additional pills, or transferring him to a medical unit or outside hospital—would have prevented his quetiapine toxicity or, at a minimum, resulted in earlier discovery and a meaningful chance of survival.

89. Instead, Mr. Kelly became unresponsive and died alone in his cell, undiscovered until breakfast rounds when another inmate alerted staff.

90. Mr. Kelly's death was foreseeable, preventable, and directly caused by Defendants' longstanding failures to:

    a. conduct supervision rounds in compliance with 10A N.C.A.C.14J .0601;
    b. monitor medically fragile detainees; and
    c. implement and enforce safe medication practices in the jail.

91. At all times relevant, Defendants Mecklenburg County and Sheriff McFadden had actual or constructive knowledge of systemic unconstitutional practices at the jail—including failures in medical care, failures to respond to serious medical needs, understaffing, and chronic supervision violations—and nevertheless failed to take corrective action.

92. There have been at least eight other deaths at the Charlotte jail with similar circumstances as Elijah Kelly, the Observer reported: Michael Trent in 2019; Michael Mangan in 2020; Karon Golightly and John Devin Haley in 2021; Francine Laney, William Rhinesmith, Russell Fincham and Derrick Geter in 2022, and Jamil Stafford.

93. Defendants Mecklenburg County and Sheriff McFadden were repeatedly placed on notice, long before Mr. Kelly's death, of:

    a.   systemic failures to conduct required rounds;

    b.   repeated DHSR citations for noncompliance with 14J .0601;

    c.   chronic understaffing;

    d.   longstanding deficiencies in Wellpath's delivery of medical care;

    e.   patterns of medical neglect and delayed response to emergent medical needs; and

    f.   reliance on electronic "scan points" in lieu of actual visual observation.

94. Despite this knowledge, Mecklenburg County and Sheriff McFadden failed to modify policies, failed to supervise or discipline personnel, failed to ensure adequate staffing, and allowed unconstitutional conditions to persist.

95. Defendants Mecklenburg County and Sheriff McFadden's deliberate indifference—through failures to act despite notice—was a moving force behind the unconstitutional supervision failures and medical-care breakdowns that caused Mr. Kelly's death.

96. Defendants Mecklenburg County and Sheriff McFadden maintained longstanding unconstitutional customs and practices, including:

    a.   treating 14J .0601 supervision requirements as optional guidelines;

    b.   routinely exceeding the 40-minute maximum interval between rounds;

    c.   permitting officers to "scan buttons" without actually observing detainees;

    d.   maintaining chronic understaffing that made lawful supervision impossible;

    e.   failing to train, supervise, or discipline deputies regarding medical emergencies;

18

f.  relying on Wellpath despite a known pattern of constitutionally deficient care; and

g.  failing to establish adequate safeguards for high-risk psychotropic medications.

97. Defendants Mecklenburg County and Sheriff McFadden's policies and omissions "manifested deliberate indifference to the rights of detainees." These unconstitutional policies and systemic failures were moving forces behind the deprivation of Mr. Kelly's Fourteenth Amendment rights and his resulting death.

98. Upon information and belief, Defendants Mecklenburg County and Sheriff McFadden were already on notice—through prior detainee medical emergencies including the Stafford incident documented in *Thomas v. McFadden*—that Wellpath and MCDC were failing to provide timely medical care and respond to life-threatening symptoms, yet failed to take corrective action.

99. Despite prior detainee medical crises— Defendants Mecklenburg County and Sheriff McFadden failed to implement any meaningful reforms to medical oversight, medication protocols, or emergency response systems before Mr. Kelly's death."

### FIRST CAUSE OF ACTION

**Deliberate Indifference Under the Fourteenth Amendment
Against All Individual Defendants in Their Individual Capacities**

100.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

101.    At all relevant times, Elijah Kelly was a pretrial detainee in the custody of the Mecklenburg County Sheriff's Office and held at MCDC. As such, he was entitled under the Fourteenth Amendment's Due Process Clause to be protected from known,

19

substantial risks of serious harm, including serious medical harm and self-inflicted injury.

102.     The individual Defendants — Sheriff Garry McFadden, Telisa White, and John Doe Officers 1–4 (Pod 1800 line officers) — acting under color of state law, knew or should have known that Mr. Kelly faced a substantial risk of serious harm due to his age, COPD and other chronic illnesses, recent hospitalization, psychiatric vulnerability, and repeated complaints of severe shortness of breath and chest pain.

103.     Mr. Kelly's serious medical and mental-health conditions — including COPD, metastatic cancer, hypertensive cardiovascular disease, chronic hepatitis C, alcohol use disorder, and documented hopelessness and inability to cope — constituted serious medical needs as that term is understood in the context of Fourteenth Amendment claims by pretrial detainees.

104.     The individual Defendants had access to, and in the exercise of reasonable care would have reviewed, Mr. Kelly's Wellpath medical records, sick-call slips, ED discharge paperwork, and DHSR-mandated observation requirements, all of which documented his medical fragility and heightened risk profile.

105.     Despite this knowledge, the individual Defendants failed to take reasonable measures to abate the risk to Mr. Kelly, including but not limited to:

a. Failing to conduct twice-per-hour visual observation rounds with no more than 40 minutes between rounds as required by 10A N.C.A.C. 14J .0601(a);

b. Failing to ensure that officers actually looked into Mr. Kelly's cell and assessed his condition rather than merely scanning electronic tour buttons;

c. Failing to monitor ingestion of quetiapine and trazodone, or to implement safeguards against hoarding despite the known risk of quetiapine abuse in correctional settings;

d. Failing to place Mr. Kelly on a higher level of observation or medical watch in light of his recent hospitalization and escalating respiratory complaints; and

e. Failing to summon timely medical evaluation or transport when Mr. Kelly's condition worsened.

106.     John Doe Officers 1–4, as the Pod 1800 officers assigned to checkpoints 1855d and 1855c, were personally responsible for conducting the rounds that DHSR later determined exceeded the 40-minute maximum on December 13, 2023. These officers knowingly failed to perform supervision rounds as required and falsely relied on electronic tour scans that did not reflect actual observation of Mr. Kelly.

107.     Defendant White, as Jail Administrator/Chief of Detention, and Defendant McFadden, as Sheriff and final policymaker, were deliberately indifferent in that they:

a. Knew that Pod 1800 staff routinely failed to perform timely, meaningful rounds;

b. Knew about repeated DHSR citations for missed rounds and understaffing;

c. Knew that reliance on electronic scan points without actual visual observation was common practice; and

d. Failed to correct, discipline, re-train, or provide adequate staffing, thereby tacitly authorizing constitutionally deficient supervision.

108.     In the face of this actual and constructive knowledge, these Defendants failed to train, supervise, and direct line staff to comply with 14J .0601(a), failed to modify Mr. Kelly's housing or observation status, and failed to implement any heightened precautions in response to his clearly deteriorating condition.

21

109.     Under the objective reasonableness standard articulated in *Kingsley v. Hendrickson*, Defendants' actions and omissions – taken together – constitute deliberate indifference to Mr. Kelly's serious medical needs and safety.

110.     As a direct and proximate result of each individual Defendant's deliberate indifference, Mr. Kelly became unresponsive in his cell, was not discovered until breakfast rounds, and died from quetiapine toxicity on December 14, 2023, after prolonged, undetected distress.

111.     Plaintiff, on behalf of the Estate, is entitled to compensatory damages, including for Mr. Kelly's pain and suffering, loss of life, and other damages to be proven at trial.

## SECOND CAUSE OF ACTION

### *Monell* Liability Against Reserve Health, Mecklenburg County and Sheriff McFadden In His Official Capacity

112.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

113.     At all relevant times, Mecklenburg County, acting through the Mecklenburg County Sheriff's Office, and Sheriff McFadden in his official capacity, were responsible for the policies, customs, practices, training, supervision, and staffing governing inmate supervision, medical monitoring, and medication administration at MCDC.

114.     On information and belief, and as evidenced by repeated DHSR citations and the Plan of Correction, Mecklenburg County and the Sheriff's Office maintained a longstanding pattern and practice of:

a. Conducting lax, irregular, and poorly documented POD tours, often limited to scanning an electronic button without actually observing inmates;

b. Allowing officers to routinely exceed the 40-minute maximum interval between rounds mandated by 10A N.C.A.C. 14J .0601(a);

c. Treating DHSR supervision standards as optional guidelines rather than binding legal requirements;

d. Failing to maintain adequate staffing levels necessary to conduct required rounds; and

e. Failing to implement effective internal monitoring (video review, auditing, discipline) to ensure compliance.

115.     The County's policies and practices relating to screening, classification, and monitoring inmates are inadequate, focusing myopically on the "acutely suicidal" (those who explicitly express current suicidal ideation or a specific plan), while ignoring detainees like Mr. Kelly, who have significant mental-health issues and risk factors (including overwhelming hopelessness and access to hoardable psychotropics) but who may deny active suicidal intent.

116.     Mecklenburg County and the Sheriff's Office also failed to implement adequate policies and safeguards for the administration of high-risk psychotropics such as quetiapine, including policies requiring direct observation of ingestion and procedures for addressing suspected hoarding.

117. DHSR's December 20, 2023, findings, documenting multiple supervision gaps on December 13, 2023, and concluding that MCDC "was not conducting supervision rounds as required," demonstrate that these supervision failures were systemic and facility-wide, not isolated.

118. In its written Plan of Correction, the Sheriff's Office expressly minimized and rationalized the supervision failures, asserting that the supervision gaps "were not significant factors" in Mr. Kelly's death, and suggesting that compliance is measured only within arbitrary "clock hours" rather than any 60-minute period. This written position constitutes official policy and ratification of unconstitutional supervision practices.

119. By maintaining and enforcing these policies, customs, and practices — and by deliberately failing to correct them despite repeated warnings — Mecklenburg County and Sheriff McFadden created an environment in which serious constitutional violations were highly predictable, including the precise harm suffered by Mr. Kelly.

120. As a direct and proximate result of these unconstitutional policies, practices, and customs, Mr. Kelly was denied his Fourteenth Amendment rights, went undetected while in medical crisis, and died from quetiapine toxicity while in MCDC custody.

121. Plaintiff is entitled to compensatory damages from Mecklenburg County and Sheriff McFadden in his official capacity under *Monell*.

## THIRD CAUSE OF ACTION

**Wrongful Death Against Individual Defendants In Their Individual Capacities and Reserve Health, Mecklenburg County and Sheriff McFadden In Their Official Capacities**

122.     Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

123.     At all relevant times, Defendants owed Mr. Kelly a **duty of reasonable care** arising from, inter alia, North Carolina statutes governing jails, 10A N.C.A.C. 14J (including 14J .0601), nationally recognized jail standards, and common law principles requiring jailers to protect detainees from foreseeable harm and to provide necessary medical care.

124.     Defendants **breached** their duties in numerous ways, including but not limited to:

a. Failing to conduct required supervision rounds at least twice per hour, with no more than 40 minutes between observations;

b. Failing to ensure that officers actually looked into Mr. Kelly's cell and assessed his well-being;

c. Failing to respond appropriately to his repeated complaints of severe shortness of breath, chest pain, and respiratory distress;

d. Failing to classify him to a higher level of medical observation or suicide/medical watch following his November 2023 hospitalization and escalating complaints;

e. Failing to implement adequate safeguards for the administration and ingestion of high-risk psychotropic medication (quetiapine); and

f. Maintaining staffing and supervision policies that made compliance with 14J .0601 effectively impossible.

125.     The foregoing acts and omissions constituted negligence and gross negligence under North Carolina law.

126.     As a direct and proximate result of Defendants' negligence and gross negligence, Mr. Kelly hoarded quetiapine, experienced undetected quetiapine toxicity and medical decline, was not discovered until it was too late for effective resuscitation and died in MCDC custody.

127.     Pursuant to N.C. Gen. Stat. § 28A–18–2, Plaintiff, as personal representative of the Estate, seeks all wrongful-death damages available under North Carolina law, including but not limited to:

   a.   the present monetary value of Mr. Kelly's life

   b.   his pain and suffering,

   c.   reasonable funeral expenses, and

   d.   such other damages as the evidence may show.

### FOURTH CAUSE OF ACTION

**Survivorship Action**
**Against All Individual Defendants in Their Individual Capacities**

128.     Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

129.     As a result of Defendants' acts and omissions described above, Mr. Kelly experienced significant pain, suffering, fear, and mental anguish prior to his death, including but not limited to the period in which he was in acute quetiapine toxicity and respiratory distress but remained undiscovered in his cell.

130.     Pursuant to N.C. Gen. Stat. § 28A–18–1, Plaintiff seeks compensation, on behalf of the Estate, for Mr. Kelly's pre-death pain and suffering proximately caused by Defendants' negligence and deliberate indifference.

## FIFTH CAUSE OF ACTION

### Injury to Prisoner by Jailer
### Against Telisa White and John Doe Officer(s)

Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

131.     At all relevant times, John Doe Officers 1–4 and Telisa White were "keepers of the jail" within the meaning of N.C. Gen. Stat. § 162–55, acting under the authority of Sheriff McFadden and charged with the care, custody, and safe-keeping of Mr. Kelly.

132.     As jailers, these Defendants had a statutory duty to avoid inflicting injury on prisoners and to comply with minimum safety and supervision standards, including those in 10A N.C.A.C. 14J .0601.

133.     By failing to conduct required rounds, failing to meaningfully observe Mr. Kelly, failing to correct known supervision deficiencies, and knowingly tolerating a practice of superficial rounds, Defendants White and the Doe Officers caused "wrong and injury" to Mr. Kelly contrary to law within the meaning of N.C. Gen. Stat.§162-55.

134.     Their conduct was so careless, reckless, and indifferent to known risks that it constituted criminal negligence for purposes of N.C. Gen. Stat.§162-55.

135.     As a proximate result of these statutory violations, Mr. Kelly suffered serious injury and death, entitling Plaintiff to recover all damages permitted under N.C. Gen. Stat.§162-55.

## SIXTH CAUSE OF ACTION

### Violation of the ADA and Rehabilitation Act
### Against Mecklenburg County

136.     Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

137.     Defendant Mecklenburg County is a "public entity" within the meaning of 42 U.S.C. § 12132, and at all relevant times received federal financial assistance within the meaning of the Rehabilitation Act, 29 U.S.C. § 794.

138.     Mr. Kelly was a "qualified individual with a disability" by virtue of his COPD, metastatic cancer, cardiovascular disease, chronic liver disease, and serious mental-health conditions, which substantially limited one or more major life activities, including breathing, walking, and caring for himself.

139.     Mecklenburg County knew or should have known of Mr. Kelly's disabilities, including through his Wellpath records, ED discharge summaries, sick-call requests, and mental health documentation.

140.     Rather than making reasonable modifications in policies, practices, and procedures to ensure equal access to safety, medical care, and supervision, Mecklenburg County maintained facially neutral policies that disproportionately endangered disabled detainees like Mr. Kelly—e.g., rigid classification and supervision systems that failed to adjust observation levels for medically and psychiatrically fragile inmates.

141.     Mecklenburg County failed and refused to provide reasonable accommodations, including but not limited to:

a. Adjusting Mr. Kelly's classification to a medical or higher-observation unit;

b. Increasing the frequency and quality of rounds in light of his disabilities;

c. Implementing enhanced medication monitoring and anti-hoarding safeguards for his psychotropic prescriptions; and

d. Ensuring that chronic understaffing and supervision failures did not deprive disabled detainees of basic safety.

143. As a result, Mr. Kelly was denied the benefits of, and excluded from participation in, the County's services, programs, and activities—including safe confinement and access to adequate medical care—by reason of his disabilities, in violation of Title II of the ADA and the Rehabilitation Act.

144. These statutory violations were a direct and proximate cause of Mr. Kelly's injuries and death. Plaintiff seeks compensatory damages, attorneys' fees, and costs as permitted by law.

### SIXTH CAUSE OF ACTION

**Wrongful Death Resulting From Negligent Design/Operation of Supervision System Against Mecklenburg County and Sheriff McFadden**

145. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

146. Mecklenburg County and Sheriff McFadden owed Mr. Kelly a duty to design, maintain, and operate a supervision and monitoring system that reasonably protects detainees from foreseeable medical crises and self-harm.

29

147. That duty includes, at a minimum, implementing functioning supervision mechanisms, adequate staffing, and policies ensuring actual visual observation rather than mere reliance on electronic scan points.

148. Defendants breached this duty by:

   a. Designing and operating a system that treated electronic tour scans as a substitute for physical observation;

   b. Failing to ensure sufficient staffing to comply with 14J .0601; and

   c. Failing to remedy known supervision deficiencies documented by DHSR and internal audits.

149. It was reasonably foreseeable that such a defective supervision system would result in undetected medical emergencies and deaths, as occurred here.

150. As a direct and proximate result of these design and operational failures, Mr. Kelly was not discovered in time to prevent or reverse his quetiapine toxicity and died in custody. Plaintiff seeks wrongful-death damages under § 28A–18–2.

## SEVENTH CAUSE OF ACTION

**Action on the Sheriff's Bond
Against Platte River Insurance Company**

151. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

152. Upon information and belief, Platte River Insurance Company is the surety on the official bond for Sheriff McFadden, as required by N.C. Gen. Stat. §§ 162-8 and 58-76-5.

153. An action on the Sheriff's bond is proper where a plaintiff states a viable §1983 claim against the Sheriff in his official capacity.

154. The acts and omissions of Sheriff McFadden and his deputies and jailers, as described above, constitute neglect, misconduct, and malfeasance committed under color of office and within the scope of the Sheriff's non-delegable statutory duties.

155. Pursuant to N.C. Gen. Stat. § 58-76-5, Platte River is jointly and severally liable on the Sheriff's bond for all damages resulting from such neglect and malfeasance, including wrongful death.

156. Plaintiff, in her capacity as representative of the Estate of Elijah Kelly, is entitled to recover on the Sheriff's bond all damages for wrongful death caused by the neglect and malfeasance of the Sheriff and his agents, as allowed by N.C. Gen. Stat. § 28A-18-2(b).

157. Such damages are in excess of $25,000, and Plaintiff may sue repeatedly on the bond until judgment is fully satisfied.

## EIGHT CAUSE OF ACTION

**Action on the Sheriff's Bond**
**Against Platte River Insurance Company**

158. Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

159. At all relevant times, Mecklenburg County and the Mecklenburg County Sheriff, acting through the Mecklenburg County Sheriff's Office ("MCSO"), owed detainees—including Elijah Kelly—a duty to exercise reasonable care in the hiring, training, supervision, and retention of adequate custodial and medical staff to ensure lawful supervision, timely medical response, and safe confinement within the

31

Mecklenburg County Detention Center ("MCDC"). This duty arises from North Carolina common law as well as statutory mandates governing jail operations, including 10A N.C.A.C. 14J .0601, N.C. Gen. Stat. §§ 153A-217–218, 162-22, and 148-19.

160. North Carolina law imposes on sheriffs a non-delegable duty to maintain safe jail conditions, ensure adequate supervision, and provide medical and mental-health care to detainees. MCSO and the County further had a duty to maintain staffing levels sufficient to comply with State regulations and nationally accepted correctional standards.

161. Defendants breached these duties by failing to staff MCDC at legally required and reasonably safe levels, and by maintaining chronic, long-standing understaffing conditions that rendered compliance with mandatory supervision and medical-monitoring requirements impossible, including:

   a. Maintaining staffing levels so low that officers were routinely responsible for supervising multiple pods simultaneously, including Pod 1800 where Mr. Kelly was housed;

   b. Assigning insufficient personnel to complete twice-per-hour rounds with no more than 40 minutes between visual observations, as required by 10A N.C.A.C. 14J .0601(a);

   c. Failing to hire, retain, or schedule an adequate number of detention officers and supervisors to monitor medically fragile detainees such as Mr. Kelly;

d.  Failing to provide adequate staffing for critical medical-response functions, including emergency response to respiratory distress, overdose symptoms, and unresponsiveness;

e.  Failing to adjust staffing or observation levels in response to Mr. Kelly's documented medical vulnerability, recent hospitalization, and repeated respiratory complaints;

f.  Relying on electronic "scan points" as a substitute for actual visual rounds due to insufficient staffing, thereby enabling falsified or incomplete checks; and

g.  Failing to implement recommended corrective actions from the North Carolina Division of Health Service Regulation ("DHSR"), which had repeatedly cited MCDC for supervision failures, missed rounds, and inadequate staffing long before Mr. Kelly's death.

162. DHSR's December 20, 2023 post-death investigation found multiple gaps in supervision on December 13, 2023—the day before Mr. Kelly's death—as well as systemic failures in conducting rounds throughout Pod 1800. DHSR concluded that MCDC "was not conducting supervision rounds as required." These failures occurred because Defendants maintained staffing levels insufficient to perform legally required duties.

163. This pattern of supervision gaps is consistent with years of prior DHSR citations issued to MCDC while under Sheriff McFadden's administration.

164. At all relevant times, MCDC was so understaffed that detention officers could not physically conduct legally required rounds, timely respond to medical emergencies,

or ensure safe operation of the facility. This chronic understaffing was known to Defendants but was not corrected.

165. As a direct and foreseeable result of Defendants' negligent staffing, Mr. Kelly was:

    a.  not visually observed for extended periods;

    b.  not monitored for signs of medical decline, respiratory distress, or quetiapine toxicity;

    c.  housed in a unit known to suffer from unreliable or falsified rounds; and

    d.  left unmonitored despite being medically fragile and psychologically vulnerable.

166. Had MCDC been staffed at legally required or reasonably safe levels, officers would have detected Mr. Kelly's medical deterioration, hoarding behavior, respiratory distress, and/or reduced responsiveness in time to prevent his death or to render life-saving medical intervention.

167. Defendants' negligent staffing was a proximate and producing cause of Mr. Kelly's undetected quetiapine toxicity, his prolonged period of unresponsiveness, the delay in summoning emergency medical care, and ultimately his death on December 14, 2023.

168. Pursuant to N.C. Gen. Stat. § 28A-18-2, Plaintiff, as personal representative of the Estate of Elijah Kelly, is entitled to recover all damages available under North Carolina's Wrongful Death Act.

## NINTH CAUSE OF ACTION

Interference with Familial Association, Violation of Fourteenth Amendment to the United States Constitution
(42 U.S.C. § 1983)
(*As Against All Defendants*)

169. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

170. Plaintiff, Mary Catherine Kelly Gorman, as Administratrix of the Estate of Elijah Kelly, and in her individual capacity as Mr. Kelly's daughter, incorporates by reference each and every preceding paragraph as though fully set forth herein, including all allegations contained in the First through Eighth Claims for Relief.

171. This claim is brought pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's rights under the Fourteenth Amendment to the United States Constitution.

172. The Due Process Clause of the Fourteenth Amendment protects a fundamental liberty interest in the integrity and companionship of the family relationship, including a parent's right to the love, care, custody, and association of their child. See *Gedrich v. Fairfax Cnty. Dep't of Fam. Servs.*, 282 F. Supp. 2d 439 (E.D. Va. 2003); *Nelson v. Green*, 965 F. Supp. 2d 732 (W.D. Va. 2013).

173. The Fourth Circuit recognizes this constitutional protection where government action (1) directly and substantially interferes with the parent–child relationship or (2) severs that bond through arbitrary or conscience-shocking conduct. See *Hodge v. Jones*, 31 F.3d 157 (4th Cir. 1994); *Baynard v. Lawson*, 76 F. Supp. 2d 688 (E.D. Va. 1999).

174. The Fourteenth Amendment guarantees every person the right to be free from arbitrary government action that deprives them of the companionship, society, and familial relationship of their loved ones. Under 42 U.S.C. § 1983, individuals may bring a civil action for damages caused by state actors who, under color of law, violate this constitutional protection.

175. At all relevant times, Defendants McFaddden and John Doe Officers acted under color of state law. Their actions—including the unlawful use of deadly force against an unarmed, non-violent, mentally-ill man, the failure to render medical aid, and the deliberate disregard of crisis-intervention protocols—constitute arbitrary and conscience-shocking government conduct that directly severed the familial bond between Elijah Kelly and his daughter.

176. As a direct and proximate result of Defendants' conduct, Mr. Kelly suffered an unconstitutional deprivation of life, and Plaintiff Gorman has been permanently deprived of her father's love, companionship, guidance, and society. This deprivation constitutes a direct and substantial interference with her liberty interest in familial association as guaranteed by the Fourteenth Amendment.

177. Defendants' conduct was willful, malicious, oppressive, and carried out in reckless disregard of the rights, safety, and emotional well-being of Mr. Kelly and his surviving family. Plaintiff is therefore entitled to recover punitive and exemplary damages against the individual Defendants to the extent permitted by law.

178. Defendants' conduct was willful, wanton, malicious, and in reckless disregard of clearly established constitutional rights. Their acts and omissions were not justified by any compelling governmental interest and served no legitimate law-enforcement purpose.

179. Accordingly, Plaintiff seeks compensatory damages for the loss of familial association and the resulting emotional distress and suffering, as well as punitive and exemplary damages against the individual Defendants to the extent permitted by law.

180. By reason of the foregoing, all Defendants are liable under 42 U.S.C. § 1983 for violating Plaintiff's Fourteenth Amendment right to familial integrity and association.

**PRAYER FOR RELIEF**

1) WHEREFORE, Plaintiff respectfully prays that this Court:

1. Grant Plaintiff a trial by jury;

2. Award Plaintiff the costs of this lawsuit;

3. Award Plaintiff reasonable attorneys' fees under 42 U.S.C. § 1988, 29 U.S.C. § 794a;

4. Award compensation for pain and suffering of the decedent prior to his death;

5. Award compensation for the loss the decedent's society and companionship;

6. Award the reasonable funeral expenses of the decedent;

7. Award any other compensatory damages to which Plaintiff is entitled under federal and state law;

8. Apportion the compensatory damages jointly and severally, where appropriate;

9. Award such punitive damages to the extent allowable by law;

10. Award treble damages pursuant to N.C. GEN. STAT. § 162–55 as to any Defendant identified as a keeper of the jail and who committed wrongful acts contributing to Mr. Kelly's death, regardless of that Defendant's potential criminal liability.

This the 10th day of December, 2025.

*/Charles Ali Everage/*
Charles Ali Everage, NCSB No.: 28267
Attorney for Plaintiff
**Hunter & Everage, PLLC**
Post Office Box 25555
Charlotte, North Carolina 28229
Telephone: 704-377-9157
Facsimile: 704-377-9160
cae@hunter-everage.com

*[S. Camille Payton]*

S. Camille Payton, NCSB No. 19947
Attorney for Plaintiff
**Hunter & Everage, PLLC**
Post Office Box 25555
Charlotte, North Carolina, North Carolina 28229
Telephone: 704-377-9157
Facsimile: 704-377-9160
scpayton@hunter-everage.com

*[Micheal Littlejohn]*

Micheal Littlejohn, NCSB No. 49353
Attorney for Plaintiff
Littlejohn Law, PLLC
Post Office Box 16661
Charlotte, North Carolina, North Carolina 28297
Telephone: 704 322-4581
Facsimile: 704 625-9396
mll@littlejohn-law.com